### TRUSTEES OF SCHOOLS
### v.
### WILLIAM A. PEAK.

*Principal and Surety—Debt on Bond—Township Treasurer.*

1. All moneys that come into the hands of a township treasurer, as such, must necessarily be and remain there in contemplation of law and in the

real sense of the bond given by him, as to the obligee, and for all the purposes of an action upon such bond until they are accounted for by some act or fact which legally discharges him from liability for them. Where they have thus come during a former term, and have not been so accounted for, they must be deemed to have come thence into his hands as treasurer for the one succeeding.

2. Not denying the fact that a balance is due from such officer, his sureties are estopped from denying it to be in his hands, and having voluntarily executed the bond, public policy would forbid that they should escape responsibility by showing that at and since the commencement of a given term he was never able to produce it.

3. The questions whether there was a balance due from such treasurer, and its amount, are not conclusively settled against the sureties upon his bond by the statement of the amount thereof in his report.

4. Even when accepted by school trustees, such report can hardly have the force and effect of a settlement, and such acceptance should not estop them from asserting error therein subsequently discovered.

5. Upon proof that a treasurer had received other moneys than those accounted for by him, school trustees can recover the same in an action on his bond, although their omission may have been entirely innocent on his part. Errors satisfactorily shown may ordinarily be corrected at law.

6. In the case presented this court holds, the treasurer being dead, that certain books and vouchers were admissible not only because they were the records of his official acts, which the law required to be kept, but because they were parts of the *res gestæ*, and for the further reason that they were as competent to prove a negative—that entries of alleged charges and credits were not made—as an affirmative.

7. It is not incumbent upon a surety to show how errors came to be made by his principal in such case; it is enough to satisfy the jury that moneys had been properly paid out by him for which he received no credit.

8. A treasurer is entitled to credit for school orders paid by him although the same may have been informal, the amount thereof being properly due for something received by the district.

[Opinion filed January 30, 1892.]

In error to the Circuit Court of Scott County; the Hon. Cyrus Epler, Judge, presiding.

Mr. James A. Warren, for plaintiff in error.

Mr. James M. Riggs, for defendant in error.

Pleasants, J.   Debt, against a surety on the official bond

of a deceased township treasurer, the other surety being also dead. Judgment on verdict for plaintiffs, in debt $7,000, damages $245.45. Being dissatisfied with the amount awarded, they sued out this writ of error.

The bond was executed May 31, 1886, upon the appointment of the principal, Jeremiah B. Bonebreak, made on the 5th of April preceding. He had then held the office continuously for several terms, and under that reappointment continued to hold it until May 21, 1888, when his successor qualified. At that time he was dying of consumption, and died a few days thereafter intestate. No letters of administration upon his estate were ever issued.

The substance of the declaration is, that during his last term he received as treasurer a large sum of money, and of it, had in his hands when his successor qualified, $3,000, which he failed to pay over on demand and unlawfully converted to his own use, and that neither he nor his securities, or either of them, have ever paid it, though a like demand was made of the defendant, as one of said sureties, before the commencement of this suit.

The pleas traverse the averments of refusal to pay over, and conversion, and allege that Bonebreak paid out and accounted for all the funds of the township that came to his hands or under his control as such treasurer from the date of said bond to the time when his successor qualified; and the issue tried was whether he was then indebted as such treasurer and to what amount.

It appears that on April 5, 1886, at the regular meeting of the trustees, Bonebreak presented for settlement his treasurer's books, which showed a balance then in his hands of $1,677.70, and he was thereupon reappointed.

On April 4, 1887, at their regular meeting, he again presented a statement of balances due the districts respectively, which aggregated $1,788.41, and corresponded with the reports he made to the district directors; and it was shown that he afterward received, as treasurer, from the county collector and other sources $3,040.29, making a total debit of $4,828.70.

The books show credits for payments on account of the mine districts made after the balances above mentioned were struck, amounting to $2,878.28. There was also oral evidence tending to show other payments by him after April 4, 1887, which were never entered on the books in October, November, and December, on school orders, of $345; and a few days before his death, on other orders, of $400.42.

These credits together would reduce the apparent balance to $1,205; to which should be added, for error in one of the footings, $100, making $1,305.

Defendant was allowed to go back of the report of April 4, 1887, and introduce thirty school orders, running in date from February, 1880, to January, 1887, amounting in all to $1,040.50, and in connection with them the treasurer's books from the earliest of those dates, for the purpose of showing that for these orders he had never given himself any credit; and also about three hundred and fifty other orders, on some of which small amounts of interest appeared to have been paid, which it was claimed had not been entered to his credit, though the principal had.

The credits thus claimed, exclusive of the amount for interest, would reduce the balance to $264.50, being only $19.50 more than was found by the verdict. What these items for interest aggregated we have not taken the pains to ascertain from the multitude of the orders, but assume that it was at least as much as this difference.

Plaintiffs objected to this evidence when offered, and excepted to the ruling of the court admitting it. They insist that the treasurer's report of April 4, 1887, was conclusive upon him and his sureties as to the amount then due, and cite for this contention Morley v. Town of Metamora, 78 Ill. 394; City of Chicago v. Gage, 95 Ill. 626; Longan v. Taylor, 130 Ill. 412.

Those were actions, like this, upon the official bond for the last of several terms held in immediate succession by the same treasurer. In an official report made during that term and pursuant to the statute, he stated the balance against himself from the preceding term as on hand. The condition of these

bonds is, in substance, that the treasurer will properly pay over or account for all moneys that shall come to his hands, as such, during the term for which the bond is given; and the sureties in these cases, not denying that their principal was a defaulter, that the balance reported was due, nevertheless claimed as a defense for themselves that the defalcation occurred and the money was squandered during the preceding term, and so was not actually in his hands during the one covered by their bond. It was held under these circumstances, that this claim was inadmissible; that the treasurer's report was conclusive on that point.

We agree that the soundness of the decisions is no more open to debate than is their authority. All moneys that come into the hands of the treasurer, as such, must necessarily be and remain there, in contemplation of law and in the real sense of the bond, as to the obligee, and for all the purposes of this action, until they are accounted for by some act or fact which legally discharges him from liability for them. Where they have thus come during a former term, and have not been so accounted for, they must have come thence into his hands as treasurer for the one succeeding. We apprehend that the ground on which these decisions rest is not the conclusiveness of the treasurer's statement, but on the fact, however made to appear, that a balance was due from the treasurer, that he had received moneys, as treasurer, for which he had not accounted. There is no special force in the words "on hand" or "in the treasury." They add nothing to the statement of the balance. Because it ought to have been on hand, in the treasury, having been there and not properly paid out or otherwise accounted for, it is conclusively presumed to have remained there. Not denying the fact that a balance was due, the sureties are estopped to deny that it was in the treasurer's hands. The trustees rightfully presumed that whatever was due was in his hands, and accepted the bond as security for its proper application. The sureties could have satisfied themselves as to its amount and the ability of the treasurer to produce it when he ought; and having voluntarily executed the bond, public policy would forbid that they should escape responsi-

bility by showing that at and since the commencement of that term he was never able to produce it. Had the trustees known it they might have refused to reappoint him and sued on the former bond; but they were not bound to know or to presume it, and the sureties on that bond may have got beyond reach or become insolvent; nor did they rely on his ability, but took security. The sureties did so rely. On grounds of public policy, therefore, they should not be permitted to make this defense. It would be a fraud upon the trustees and might work serious injury.

In the cases cited, the question before the court was not whether there was a balance due, nor what was its amount, but whether it was in the treasurer's hands at the time stated. But that is not the question here. It was admitted that whatever balance was due from the treasurer at the close of the preceding term, in contemplation of the law and of the bond sued on, came to his hands as treasurer during the term covered by it, and that for his failure to pay over to his successor, or otherwise account for that balance, the defendant, as his surety, is responsible. The questions sought to be made were whether there was such a balance and of what amount. Are those questions conclusively settled against the surety by the statement of the amount in his principal's report?

A majority of this court are inclined to the opinion that the Supreme Court, notwithstanding some broad expressions *arguendo*, has not so decided, and that on principle it ought not to be so decided. No such reason as estops the principal to deny his statement that the balance due was actually in his hands applies to his statement of the amount of that balance. That is but a statement of the difference between the sums of the items debited, and those credited on the account as stated by him. It is in no sense a contract or evidence of a contract. It works no change in previously existing facts. It creates no obligation, invests no interest, transfers no right. Its correctness as a statement depends on that of the debits and credits, which are but receipts and charges made and given by the treasurer alone, and in their nature subject to correction for error in favor and at the instance of anybody who would other-

wise be injured. Even when accepted by the trustees, the report can hardly have the force and effect of a settlement. Settlements ascertain the balance between those who were parties to the several transactions stated in their respective accounts, and may, therefore, be alike presumed to know the facts. Thus the balance is ascertained from mutual admissions, which have the more weight because of this presumption and of the deliberation with which they are made; and hence also the settlement is just as binding upon the one as upon the other. Yet even such settlements are not conclusive upon either, because of the known liability to error, especially from omissions.

But here the trustees were not parties to the transactions reported by the treasurer. They paid no money to him nor received any from him, and the balance really due belonged, not to them, but to the people of the respective districts. For what they can know of the completeness and correctness of his account in such cases, they must depend, to a greater or less extent, upon his statement. It is hardly practicable for them to go to all the sources from which he might have received school moneys, or to ascertain for themselves the genuineness and truth of his vouchers. For these reasons their acceptance of his sworn statement ought not to estop them from asserting error therein against the districts subsequently discovered. Upon due proof that he had actually received other school moneys than those so accounted for, we have no doubt they could recover it in an action on his bond, although its omission may have been entirely innocent on his part. And having shown its receipt, what better, or indeed what other primary evidence could be offered to show it had not been accounted for, than his vouchers and book entries from the date of its receipt?

· If their acceptance and approval of his account would not conclude them, why should its statement conclude him ? That it was made under oath and in pursuance of a statutory re-quirement would not impart to it the character of a contract or conveyance, which would require the power of a court of chancery to correct, and only upon proof that the mistake was

mutual. It remains, in fact, what it otherwise would have been, the statement of an account. These circumstances and others here appearing, the lapse of time and intervening settlements since the alleged errors occurred, may add to its weight as evidence of the actual balance, and require stronger and clearer proof to warrant correction; but they do not make it conclusive. If errors are satisfactorily shown they should still be corrected, and by a court of law, if no right of third parties has intervened or positions been changed or conduct induced, which would make it unjust. Eddie v. Eddie, 61 Ill. 134; Town v. Wood, 37 Ill. 512; Aultman & Co. v. Graham, 29 Ill. App. 77.

Had the statement, as presented and accepted on April 4, 1887, been completed on the 1st, and on the 2d the treasurer had paid a proper school order for $10, which he had inadvertently omitted to enter, can it be doubted that he or his surety would have had the right to produce the voucher and his books, and have the correction made to his credit? The difference between that case and this is one of degree only and not of kind. In Cassady v. Trustees of Schools, 105 Ill. 560, the Supreme Court say that the treasurer's books, being such as the law requires to be kept, and constituting the official record of his acts, "are therefore, on general, well recognized principles, admissible in evidence for or against all persons having any interest in such entries, or the facts to which they relate, including the treasurer and the sureties on his bond," citing authorities. It is not intimated that a "settlement" has the effect to shut out all anterior entries, and we perceive no reason why it should, especially where the question is as to the correctness of the settlement. The suit was upon the last of several successive bonds, which was executed on the 29th of March, 1887, and about the 27th of June next following, the treasurer was removed for cause. It is to be inferred that he presented his books and accounts and settled on entering upon that term. The defendants objected to the books showing his receipts and disbursements, as entered by him prior to the execution of the bond sued on, but the Supreme Court held their admission proper, say-

ing, as quoted, that they were admissible for and against the treasurer and his sureties. In this case the treasurer being dead, we are of opinion that they were admissible, not only because they were the records of his official acts, which the law required to be kept, but because they were parts of the *res gestæ*. Lawrence v. Stiles, 16 Ill. App. 494 *et seq.*, and the authorities there cited. And further that they were just as competent to prove a negative—that entries of alleged charges and credits were not made—as an affirmative. Furness v. Cope, 5 Bing. 114; Bank v. Boreaf, 1 Rawle, 152; Nourse v. McKay, 2 Rawle, 70; Bank of Monroe v. Culver, 2 Hill, 552; McLean Co. Bank v. Mitchell, 88 Ill. 52. For the reason of the rule see Am. Notes upon Smith's Leading Cases, Vol. 1, (top) p. 506 (6th Am. Ed).

Here the treasurer may not have been a good bookkeeper, nor of methodical business habits. His duties as treasurer called him to action only occasionally and irregularly. He had other business that engaged him generally. His health was infirm, for how long a time does not appear, and he died of a lingering disease only a few days after his successor was appointed. He was in no condition, after that appointment, to look over and settle the affairs of his office. One book that he kept was not turned over, nor found after his death. Demand was made upon the appellee, his surety, for $2,216.77, based upon the balance stated in the account of April 4, 1887, modified only by subsequent transactions, not all of which had been entered on the books. Appellee was certainly justified in looking into the books and outside to ascertain the correctness of that balance and of the amount demanded of him. Having obtained permission to examine the books and vouchers turned over to the successor, he procured the assistance of an expert accountant, and with him went through and compared them from the beginning. The result was that they found among the canceled vouchers the thirty orders here in question, for which they claim they could find no entry of credit on the books, either separately or included in any that were entered. That they were all proper orders, and that he actually paid them, is not denied or doubted. He

Trustees of Schools v. Peak.

should therefore have had credit for them. If really errors they were not wilfully made against his own interest. He may have made these payments when and where it was not convenient to enter them, mislaid the vouchers, and forgotten them when he came to write up his books. But it was not incumbent on the surety to show how the errors came to be made. It was enough for him to satisfy the jury that his principal had in fact paid the orders and had not credited himself with them. Appellee came into court disputing, not his liability for the balance actually due from the treasurer, but the amount of that balance. The claim of appellants was based upon the balance reported April 4, 1887, which was ascertained and struck from data appearing on the book. Appellee claimed that these data were incomplete, and that, supplying the credits omitted in error, it should be greatly reduced. He offered to submit to the jury for their closest scrutiny the vouchers he claimed to have been omitted, and the books to show such omission, with the testimony of the accountant who had examined and compared them. We think this evidence was rightly received.

This disposes of the principal question of law in the case. Appellants complain of the admission in evidence of the other orders, on some of which it appeared that interest had been paid, which it was claimed was not credited, in connection with the instruction given that in finding the balance actually due the jury should consider all the vouchers and book entries, on the ground that some of these orders were on accounts for which the law did not allow interest. But the jury was fully instructed, in accordance with the views of appellants, as to what accounts would lawfully draw interest. It can not be presumed that the jury allowed for the payment of interest upon any orders that did not lawfully draw it, and we do not see how they could determine whether the items of credit claimed to have been omitted were in fact omitted, without having all the vouchers before them for comparison with the book entries.

It is said also that some of the orders admitted were signed by the clerk of the board of directors only, while the statute

required that they should be signed by the president or by a majority of the board as well; and a decision of the Supreme Court is cited (Glidden v. Hopkins, 47 Ill. 525), holding that an action could not be maintained upon an order so drawn. Certainly the treasurer would not be bound to pay it; but if he did pay it, notwithstanding its informality, and the amount was really due for that which the district had actually received, we think he should be allowed credit for it. According to our recollection there were but two of that form, each for a small amount, and the justice of the claims was not denied.

Upon the questions of fact, the least satisfactory of the findings of the jury was as to $665 of the $2,878.28, credited on the books for payments on account of the several districts made after the settlement of April 4, 1887, as follows:

District No. 1, D. Ward........................ $ 60 00
District No. 3, J. B. Bonebreak................. 230 00
District No. 3, H. L. Mason.................... 150 00
District No. 6, Lottie Borum................... 75 00
District No. 7, G. W. Riley.................... 150 00

$665 00

It is denied that he paid either of these items or any part of either. Mr. Baird, his successor, testified that he, as treasurer, paid an order in favor of Ward, dated April 20, 1887, for $59.82, which is assumed to be the one first above mentioned; that of the second (to Bonebreak) he paid one for $80, and another for $150 is still in the bank unpaid; that he paid all those issued to Mason, being five, for $50 each; that he paid one for $40 to Lottie Borum, which must have been part of the sum credited to himself by the deceased treasurer; that there were issued to Riley only six orders, for $50 each, and he paid them all, and that therefore the item of $150 credited by the deceased treasurer as having been paid to him must have been fictitious.

This testimony imputes to the dead treasurer the grossest and most deliberate fraud, practiced while he was almost *in extremis*. Yet no reflection is cast upon the honesty and integrity of his previous life. He had charged himself most

Trustees of Schools v. Peak.

faithfully with all that he had received, and his errors, if they were errors, were against himself. His entries of credit were competent evidence for himself and his sureties. His vouchers and books (with one exception) were turned over to his successor, upon short notice of his removal and before he could have had time, in the condition of his health, to revise and fraudulently alter or add to them in his own interest. The names, dates and amounts given in these orders, were certain means to convict him of the fraud if any had been committed. How he could get these particulars, the most of which are shown to have been correct, and none positively shown to have been incorrect or fictitious, unless the orders were presented to him, does not appear. These circumstances certainly give some additional weight to his entries.

On the other hand it is noticed that his successor did not state that orders for these items were not among those turned over to him, nor whether he paid those he claims to have paid, to the payees therein named. No one of these payees was produced to show of whom he or she received payment. The two orders to Bonebreak were payable to his order, and yet neither was indorsed. He might well have credited himself with them without indorsing them, if he surrendered them to his successor; but that a banker should cash and receive one so made, without his indorsement, would be strange.

If they were paid twice, they must have been wrongfully reissued by, or wrongfully obtained from Bonebreak or Baird, and could have been by or from one as well as the other. These circumstances certainly tend in some degree to weaken the testimony of Baird as against the book entries of the man whose lips were sealed by death against explanation. They were doubtless discussed at large before the court and jury who saw and heard the witnesses. It was an important question of fact in the case. To us, who had not their advantages, the finding either way might not be satisfactory. The jury gave credit to the entries. The judge saw no sufficient reason for interfering with their conclusion. We think it would be unprofitable to undertake a discussion and comparison of the weight of the facts and arguments relied on by the parties

respectively. We are by no means clear as to what would be a just conclusion. Had the jury found for the plaintiffs as to these disputed items and the judge refused to disturb it, we should have been content with that result. If appellants have sufficient confidence in their views as to the main question of law involved to take the case to the Supreme Court, we should be quite willing to have that tribunal pass, if they think they lawfully may, upon this question also.

We see nothing in the action of the court below upon the instructions asked to call for comment. A very large number were given for plaintiffs, covering all the phases of the case as they claim it, and we see no substantial error in those given for defendant, or in the refusal or modification of any asked for plaintiffs. The judgment will therefore be affirmed.

*Judgment affirmed.*